IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| DR. MICHAEL D'ANDREA, | ) | CIVIL NO. 09-00105 JMS/BMK |
| | ) | |
| Plaintiff, | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| vs. | ) | JUDGMENT ON PLAINTIFF'S THIRD |
| | ) | AMENDED COMPLAINT FOR |
| UNIVERSITY OF HAWAII; DENISE | ) | DECLARATORY AND INJUNCTIVE |
| KONAN, FORMER INTERIM | ) | RELIEF AND DAMAGE |
| CHANCELLOR, UNIVERSITY OF | ) | |
| HAWAII; RANDY HITZ, FORMER | ) | |
| DEAN OF THE COLLEGE OF | ) | |
| EDUCATION, UNIVERSITY OF | ) | |
| HAWAII; DONALD YOUNG, DEAN | ) | |
| OF THE COLLEGE OF | ) | |
| EDUCATION, UNIVERSITY OF | ) | |
| HAWAII; JOHN DOES 1 TO 10; | ) | |
| AND JANE DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGE

## I. INTRODUCTION

On March 9, 2009, Plaintiff Michael D'Andrea ("Plaintiff"), formerly a tenured professor at the University of Hawaii (the "University"), filed the present action asserting various constitutional and statutory claims related to his suspension and termination from employment at the University. Plaintiff

previously contested his treatment at the University in a suit filed in this court on April 11, 2007 ("the First Action").  Plaintiff settled his claims in the First Action by signing a Mutual Release and Settlement Agreement (the "Settlement Agreement") on August 7, 2007.

The University, Denise Konan ("Konan"), former interim chancellor of the University, Randy Hitz ("Hitz"), former dean of the University's College of Education ("COE"), and Donald Young ("Young"), dean of the COE (collectively "Defendants") now bring a Motion for Summary Judgment ("Defendants' Motion").  Defendants contend that Plaintiff's claims are barred by the Settlement Agreement and, in any event, that no genuine issues of material fact remain as to any of Plaintiff's claims.  The court agrees as to the Settlement Agreement and, based on the following, GRANTS Defendants' Motion.

## II. <u>BACKGROUND</u>

**A.    Factual Background**

*1.    Plaintiff's Behavior*

On August 1, 1989, the University hired Plaintiff as a tenure track full-time faculty member in the Department of Counselor Education (the "Department") in the COE.  Pl. Decl. ¶¶ 8-9.  During Plaintiff's employment, the University received complaints and criticisms of Plaintiff's behavior, including

allegations from multiple colleagues that Plaintiff created a hostile work environment. *See*, *e.g.*, *id.* ¶¶ 21, 29, 32, 64, 66, 76. Louis Chang ("Chang"), an arbitrator mutually selected to mediate one of the University's disciplinary actions against Plaintiff, characterized Plaintiff as "assertive, disagreeable, abrasive, acerbic, insensitive, and abusive of people, process and procedure." Sato Decl. Ex. C at 39.

Plaintiff likewise filed a multitude of complaints and grievances during his employment at the University. Between July 2005 and September 2006, Plaintiff filed more than 70 formal complaints and grievances. *Id.* Ex. C at 7-8. Chang characterized these complaints as concerning "a sundry list of allegations" including complaints about:

> [F]aculty qualifications, claimed ethical violations,
> refusals of faculty members to meet with [Plaintiff],
> course assignments, disrespectful, hostile and retaliatory
> behaviors, professional credentials, teaching
> qualifications, accreditation, violation of privacy
> interests, improper disputed communications, misuse of
> power, faculty assignments, academic freedom rights and
> interference with professional/ethical responsibilities,
> institutional racism and sexism in the [COE] and
> governance of the [Department].

*Id.* Ex. C at 7.

Among those who complained about Plaintiff's behavior were Marta Garrett ("Garrett"), an untenured associate professor with the Department,

Geoffrey Kucera ("Kucera"), chair of the Department, Lori Sakaguchi ("Sakaguchi"), a former graduate student and former graduate assistant of the Department, and Sheryl Tashima ("Tashima"), administrative officer within the COE. Garrett formally complained about Plaintiff's behavior on August 27, 2005 (the "Garrett Complaint") after Plaintiff and Garrett disagreed about the accreditation process for the Department. *Id.* Ex. A at 11-13, 16. Garrett contended that Plaintiff insulted her, was "openly aggressive or hostile" and "was trying to intimidate" Garrett. *Id.* Ex. A at 16. On August 30, 2005, Kucera sent a letter to Hitz in support of the Garrett Complaint, stating that he could "confirm through personal knowledge the veracity of" Garrett's complaints with Plaintiff. *Id.* Ex. A at 17. Thereafter, on August 30, 2005 and September 8, 2005, Plaintiff filed complaints against Garrett and Kucera for allegedly violating Department policies related to faculty-to-faculty complaints. Pl. Decl. ¶ 63.

Sakaguchi participated in an earlier complaint against Plaintiff and complained about Plaintiff's behavior again after Plaintiff sent a letter to Sakaguchi at her home. Sato Decl. Ex. B at 6, 9. Plaintiff mailed Sakaguchi a letter on December 7, 2005 stating that he was aware of Sakaguchi's "negative" concerns about Plaintiff and requesting that she meet with him. *Id.* Ex. B at 8-9. Sakaguchi filed a complaint (the "Sakaguchi Complaint") upon receiving the letter.

4

Sakaguchi felt the letter was retaliatory and that Plaintiff had inappropriately used her home address in an attempt to intimidate and threaten her.  *Id.* Ex. B at 9.

Tashima complained about Plaintiff's behavior on November 21, 2006 (the "Tashima Complaint") after Plaintiff visited her office to review his personnel files.  Defs.' Statement of Material Facts ("Defs. SMF") ¶ 20.[1]  Plaintiff used a tape recorder to orally record his notes on his personnel files.  Tashima complained because she felt Plaintiff spoke loudly to intimidate and scare her as he made his recording.  Sato Decl. Ex. C at 14.  Tashima stated that Plaintiff also closed or nearly closed the door to Tashima's office in an effort to intimidate or threaten her.  *Id.* Ex. C at 15.  Plaintiff thereafter filed a complaint against Tashima alleging that her report was false, slanderous, and harmful.  Pl. Decl. ¶ 122.

As a result of these and other pending complaints, the University removed Plaintiff from his teaching assignments and directed him to work exclusively from home.  Kenneth M. Nakasone Decl., Dec. 14, 2009 ("Nakasone Decl.") Ex. 1 ("First Action Compl.") ¶ 14.  In a March 2, 2007 letter, Konan stated that Plaintiff's behavior was "intimidating and bullying."  First Action Compl. Ex. A at 1.  "The University must take immediate action to respond to

---

[1]  For purposes of this Order, Plaintiff does not dispute some of the facts set forth in Defendants' SMF.  Where Plaintiff does not dispute a particular fact, the court cites directly to Defendants' SMF.

these concerns to avoid further disruption of the operations of the University," Konan wrote. *Id*. Konan's letter specified that the University's decision to reassign Plaintiff to work from home was "not a disciplinary action" nor a suspension. *Id*. Konan's letter directed Plaintiff that he was prohibited from coming onto the University campus and from contacting University students and individuals at the COE. *Id*. at 2.

### 2.   *University Grievance Process*

The University's grievance process is governed by the 2003-2009 Agreement (the "CBA") between the University of Hawaii Professional Assembly (the "Union") and the Board of Regents of the University of Hawaii. Sato Decl. Ex. A at 4-5. Article XVII of the CBA governs disciplinary actions instituted by the University against employees covered by the CBA.

Article XVII sets out a six-step process that the University must follow before suspending or discharging a faculty member. *Id*. First, a statement must be submitted in writing stating the grounds for suspension or dismissal of a faculty member. Second, that faculty member has fifteen days to file an answer; if no answer is filed, the faculty member may be suspended or discharged. Third, if the faculty member disputes the charge, the University Chancellor ("Chancellor") or a committee appointed by the Chancellor reviews the recommended suspension

or discharge.  The Chancellor must issue a report and render a decision.  Fourth, if the Chancellor decides to proceed with the suspension or discharge, the Chancellor must notify the faculty member.  Fifth, the faculty member may then file a grievance; if no grievance is filed within fifteen days, the Chancellor may proceed with the suspension or discharge.  Sixth, the University "shall not discharge or suspend the faculty member during the foregoing procedures, including the grievance procedure."[2]  *Id.* Ex. A at 5.  During this process, the Union or the faculty member may seek arbitration, which is "final and binding" upon the University and the faculty member.  *Id.*

The University pursued the Garrett Complaint through the grievance process and Plaintiff was ultimately suspended for fourteen days.  *Id.* Ex. A at 3. In fall 2005, Tashima and Paul Kingery ("Kingery"), associate dean for research for the College, investigated the Garrett Complaint and Kucera's supporting statement.  On December 19, 2005, Tashima and Kingery presented Hitz with a report and on February 2, 2006, Hitz recommended that Plaintiff be suspended for fourteen days.  Hitz found that Plaintiff "created a hostile environment that [made]

---

[2]  Step six further provides that "the Chancellor may temporarily reassign the Faculty Member, or place the Faculty Member on administrative leave with pay, if the Chancellor believes that the Faculty Member's continuance may disrupt the operations of the University." Sato Decl. Ex. A at 5.  Konan presumably acted pursuant to this clause when he reassigned Plaintiff to work from home and removed him from his teaching duties on March 2, 2007.

problem solving and the civil exchange of ideas impossible." *Id*. Ex. A at 24.

Plaintiff then met with Konan, the Interim Chancellor, on January 9, 2007, and on

February 22, 2007, Konan confirmed the recommended suspension. Plaintiff then

filed a grievance and on November 14, 2007, the Union requested arbitration. The

matter was arbitrated in May and July 2008 and on December 3, 2008, the

arbitrator found that the University had proper cause to suspend Plaintiff. At that

point, Plaintiff's fourteen-day suspension was finalized. *Id*. Ex. A at 1, 3, 45.

  The University likewise pursued the Sakaguchi Complaint through the

grievance process and suspended Plaintiff for thirty days. *Id*. Ex. B at 10.

Tashima and Mona Chock ("Chock"), Hitz's assistant at the time, investigated the

Sakaguchi Complaint. On February 23, 2006, Tashima and Chock presented Hitz

with a report and on February 24, 2006, Hitz recommended that Plaintiff be

suspended for thirty days. On February 22, 2007, Konan affirmed Hitz's

recommendation. Plaintiff then filed a grievance and the parties agreed to arbitrate

on November 14, 2007. The matter was arbitrated in September 2008, and on

February 9, 2009, the arbitrator found that the University had proper cause to

suspend Plaintiff. At that time, Plaintiff's thirty-day suspension was finalized. *Id*.

Ex. B at 1, 9-10, 71.

  Finally, the University pursued the Tashima Complaint through the

grievance process and ultimately terminated Plaintiff's employment.  *Id*. Ex. C at 14-15.  Following a review within the Department, on March 5, 2007, Young, who had replaced Hitz, issued three separate recommendations that Plaintiff be terminated -- one of which rested on the Tashima Complaint.  *Id*.; Pl. Decl. ¶ 136. In July 2007, Konan supported all of Young's three recommendations to terminate Plaintiff.  Pl. Decl. ¶ 137.  Plaintiff thereafter filed a grievance, and the parties participated in arbitration in May, July, and August 2009.  Sato Decl. Ex. C at 1. On November 4, 2009, the arbitrator found that the University had proper cause based on the Tashima Complaint to discharge Plaintiff.  At that time, Plaintiff's discharge became final.[3]  *Id*. Ex. C at 55-56.

The Decisions and Arbitration Awards concerning Plaintiff's fourteen- and thirty-day suspensions were confirmed by the Hawaii First Circuit Court on April 13, 2009 and April 27, 2009 respectively.  Sato Decl. Ex. F; *id*. Ex. G.

### 3.    *Executive Policy E9.210*

The University's Executive Policy E9.210 (the "Executive Policy"),

---

[3]  Plaintiff states in the Third Amended Complaint ("TAC") that on June 28, 2007, Konan "affirmed the recommendation made by Defendant Young and terminated" Plaintiff.  TAC ¶ 37. Although Defendants urge the court to find that Plaintiff made a judicial admission that he was terminated on June 28, 2007, the court will not imbue such significance to an inartful pleading. Based on the arbitration decision, it is clear that Plaintiff's termination became final on November 4, 2009, not June 28, 2007.  Sato Decl. Ex. C at 55-56.

titled Workplace Non-Violence, is intended "to increase awareness and protect

[University] employees and the public against violence." Defs.' Ex. P-1 at 2.[4]  The

Executive Policy prohibits "work related or workplace violence against

[University] students, faculty, staff, and visitors."  *Id.*  Under the Executive Policy,

> [p]rohibited violent acts involve physical attack, property
> damage, as well as verbal statements that express or
> suggest the intent to cause physical or mental harm to
> another person.  More specifically, violent behaviors
> include but are not limited to hitting, pushing and
> shoving; throwing or breaking objects; theft; shouting or
> yelling; threatening gestures or remarks; disruptive or
> hostile actions; abusive or belligerent language, sabotage
> of equipment; repetitive unwanted phone calls, notes or
> emails, etc.

*Id.* at 2-3.

In pursuing the Garrett, Sakaguchi and Tashima Complaints, the

University contended that Plaintiff violated the Executive Policy by creating a

hostile work environment, intimidating colleagues, and acting in a retaliatory

manner, among other things.  Sato Decl. Ex. C at 24-33.  Plaintiff disputes the

constitutionality of the Executive Policy and contends that its terms are

impermissibly vague, overbroad, and without clear definition.  TAC ¶ 48; Pl. Decl.

¶ 79.

---

[4] Although Defendants' Exhibit P-1 is unnumbered, the court counts its pages
consecutively and cites them accordingly.

### 4.      *The First Action*

On April 11, 2007, Plaintiff filed the First Action against the University and Konan.  Plaintiff stated in the Complaint to the First Action that "[t]here are ongoing disciplinary and related grievance processes between [Plaintiff] and [the University]."  First Action Compl. ¶ 13.  Plaintiff then described Konan's March 2, 2007 letter reassigning Plaintiff to work from home and prohibiting Plaintiff from coming onto the University campus and contacting students and COE employees.  *Id*. ¶¶ 14-16.  Based on these facts, the First Action asserted five claims: (1) a First Amendment claim concerning the University's ban on Plaintiff communicating with students and colleagues; (2) a procedural due process claim related to the communication ban; (3) a substantive due process claim alleging that the University had wrongly restricted Plaintiff's right to free movement; (4) a substantive due process claim alleging that the University had violated Plaintiff's rights to intimate association and privacy; and (5) a tort claim for intentional infliction of emotional distress ("IIED").  *Id*. ¶¶ 23-35.

On August 7, 2007, Plaintiff entered into the Settlement Agreement and agreed to "forever release, acquit, and discharge UH and Konan from and on account of any and all Claims" in exchange for $30,000.  Nakasone Decl. Ex 2 at 4.  In addition to Plaintiff, signatories to the Settlement Agreement included the

University and Konan, as well as attorneys for all parties.  *Id*. at 10.[5]  The

Settlement Agreement defines "UH" to include the University as well as its "past,

present and future officers, regents, employees, agents, [and] administrators . . . ."

*Id*. at 2.  The Settlement Agreement defines "Claims" to include:

> [A]ll claims, causes of action, complaints, appeals,
> liabilities, obligations, promises, covenants, agreements,
> controversies, suits and debts, whether known or
> unknown, pled or unpled, suspected or unsuspected,
> concealed or unconcealed, for compensation,
> compensatory damages of whatever type and nature,
> statutory damages, punitive damages, attorney's fees,
> costs, equitable relief, arising out of or relating in any
> way to the Litigation and the Complaint, including but
> not limited to the claims that were asserted and could
> have been asserted in the Complaint.
>
> In addition, the term "Claims" shall include, but is not
> limited to any and all claims, charges, demands, damages
> and causes of action for tort claims of any nature or kind
> whatsoever . . . arising out of or relating in any way to
> the Litigation and the Complaint, including but not
> limited to the claims that were asserted and could have
> been asserted in the Complaint.

*Id*. at 3.

The Settlement Agreement includes three exceptions to its broad

release terms:

---

[5]  The court cites to the Settlement Agreement by page number because some of its
paragraphs are unnumbered.

(i)     The releases shall not affect the Stipulation and Order, including but not limited to the Parties responsibilities and obligations under the Stipulation and Order, which shall remain in full force and effect;

(ii)    The releases shall not affect any proceedings, claims, grievances and/or other actions instituted prior to the execution of this Agreement pursuant to the 2003-2009 Agreement by and between UH Professional Assembly and the Board of Regents of UH ("CBA") except for the parallel grievance received March 20, 2007, alleging claims regarding and relating to the March 2, 2007 letter from Konan . . . ; and

(iii)   The release shall not affect the Parties responsibilities and obligations under this Agreement.

*Id*. at 4-5.

## B.     Procedural Background

Plaintiff filed his complaint on March 9, 2009.  The TAC alleges claims against Defendants for violation of Plaintiff's speech rights under the First and Fourteenth Amendments (Count I); retaliatory suspension and termination in violation of Title VII and Hawaii Revised Statutes ("HRS") § 378-2 (Count II); violation of Hawaii's Whistleblowers' Protection Act, HRS § 378-61 (Count IV); and IIED (Count V).  In addition, Plaintiff challenges the constitutionality of the Executive Policy (Count III).

On December 14, 2009, Defendants filed their Motion for Summary Judgment on Plaintiff's Third Amended Complaint for Declaratory and Injunctive

Relief and Damage.  On January 26, 2010, Plaintiff filed an Opposition, and on

February 2, 2010, Defendants filed a Reply.  A hearing was held on February 16,

2010.[6]

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of

material fact and the moving party is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who

fails to make a showing sufficient to establish the existence of an element essential

to the party's case, and on which that party will bear the burden of proof at trial."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of*

*Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of

informing the court of the basis for its motion and of identifying those portions of

the pleadings and discovery responses that demonstrate the absence of a genuine

issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th

Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004).  "When the moving party has

---

[6] At the hearing, the court also heard arguments on Plaintiff's Motion for Partial
Summary Judgment ("Plaintiff's Motion").  As a result of this order, Plaintiff's Motion is
DENIED as moot.

carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

      "An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

# IV. <u>DISCUSSION</u>

The University contends that it is entitled to summary judgment because Plaintiff released his present claims pursuant to the Settlement Agreement. Plaintiff does not contest the validity or binding effect of the Settlement Agreement, but contends that his present claims are not covered by the Settlement Agreement because (1) Plaintiff's suspensions and termination had not taken effect at the time of the Settlement Agreement and (2) Plaintiff's suspensions and termination were exempted from the Settlement Agreement.

Because the court finds that Plaintiff's claims were released by the Settlement Agreement, the court does not reach the University's additional arguments.

## A. **Plaintiff's Settlement Agreement**

In Hawaii, "[a]s a general rule, a properly executed settlement precludes future litigation for its parties." *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Haw. 277, 288, 172 P.3d 1021, 1032 (Haw. 2007) (citation omitted); *Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 570, 825 P.2d 1053, 1059 (1992) ("A compromise or settlement agreement disposes of all issues the parties intended to settle.") (citation omitted). Settlement agreements "bring[] finality to the uncertainties of the parties" and their

16

enforcement is "consistent with [the Hawaii Supreme Court's] policy to foster amicable, efficient, and inexpensive resolution of disputes." *Id.*, 172 P.2d at 1032. Settlement agreements "are simply a species of contract" and are governed by the principles of contract law. *Wong v. Cayetano*, 111 Haw. 462, 481, 143 P.3d 1, 20 (2006); *see also State Farm Fire & Cas. Co. v. Pac. Rent-All, Inc.*, 90 Haw. 315, 323-24, 978 P.2d 753, 761-62 (1999).

In this case, pursuant to the Settlement Agreement, Plaintiff agreed to "forever release, acquit, and discharge UH and Konan from and on account of any and all Claims." Nakasone Decl. Ex 2 at 4. By the terms of the Settlement Agreement, Plaintiff's release of UH included a release of all Defendants in the present case. The Settlement Agreement defined "UH" to include the University as well as its "past, present and future officers, regents, employees, agents, [and] administrators . . . ." *Id.* at 2. The Settlement Agreement thus released Konan, by name, and UH, which includes the University, as well as Hitz and Young -- both of whom are past or present employees and administrators at the University. TAC ¶¶ 8-9.

Given that the Settlement Agreement pertains to all Defendants, the issue then becomes whether Plaintiff's release of "any and all Claims" includes the claims now at issue in the present case. The Settlement Agreement defines

"Claims" to include:

> [A]ll claims, causes of action, complaints, appeals,
> liabilities, obligations, promises, covenants, agreements,
> controversies, suits and debts, whether known or
> unknown, pled or unpled, suspected or unsuspected,
> concealed or unconcealed, for compensation,
> compensatory damages of whatever type and nature,
> statutory damages, punitive damages, attorney's fees,
> costs, equitable relief, arising out of or relating in any
> way to the Litigation and the Complaint, including but
> not limited to the claims that were asserted and could
> have been asserted in the Complaint.
>
> In addition, the term "Claims" shall include, but is not
> limited to any and all claims, charges, demands, damages
> and causes of action for tort claims of any nature or kind
> whatsoever . . . arising out of or relating in any way to
> the Litigation and the Complaint, including but not
> limited to the claims that were asserted and could have
> been asserted in the Complaint.

Nakasone Decl. Ex 2 at 3.  Thus, Plaintiff's present claims are included in the

"Claims" released by the Settlement Agreement if Plaintiff's claims "aris[e] out of

or [relate] in any way" to the complaint or litigation in the First Action or "were

asserted" or "could have been asserted" in the First Action's complaint.  *Id.*

**B.**      **Breadth of Plaintiff's Release in the Settlement Agreement**

**1.**      ***Claims that "could have been asserted" in the First Action***

      **a.**      *Counts I, II, IV, and V: Claims based on Plaintiff's allegedly retaliatory suspensions and termination*

Plaintiff's claims in Counts I, II, IV, and V -- which arise under the First Amendment, Title VII, the Hawaii Whistleblowers' Protection Act, and Hawaii tort law respectively -- all concern Plaintiff's allegedly retaliatory suspensions and termination.  The court must therefore determine whether Plaintiff could have asserted these retaliation claims in the First Action.

Plaintiff's various retaliation claims all require evidence of an adverse employment action.  In the First Amendment context, "a government act of retaliation need not be severe and it need not be of a certain kind."  *Cosalter v. City of Salem*, 320 F.3d 968, 975 (9th Cir. 2003).  Reassignment to another position or banishment from employment functions is sufficient to show an adverse employment action in a First Amendment context.  *Id.* (citations omitted). Likewise, "any form of retaliation by [] employers" may support a charge under the Hawaii Whistleblowers' Protection Act.  *Crosby v. State Dept. of Budget & Fin.*, 76 Haw. 332, 341, 876 P.2d 1300, 1309 (1994) (quoting Sen. Stand. Com. Rep. No. 1127, in 1987 Sen. Journal, at 1392).

For the purposes of Plaintiff's Title VII retaliation claim, an adverse

19

employment action is one that "a reasonable employee would have found . . .

materially adverse, which in [the retaliation] context means it well might have

dissuaded a reasonable worker from making or supporting a charge of

discrimination." *Burlington N. R.R. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68

(2006). Threats may rise to the level of an adverse employment action in a

retaliation claim if, under the particular circumstances, those threats would have

deterred a reasonable employee from engaging in protected activity. *See*

*Burlington*, 548 U.S. at 68; *Martin v. Gates*, 2008 WL 4657807 at *10-11 (D.

Haw. Oct. 20, 2008) (finding that employee made a prima facie claim of retaliation

where employer made threat of severe disciplinary action). Threats sufficient to

deter an employee from engaging in protected activity may include threats to

terminate employment, reduce compensation, or impose administrative leave.

*E.E.O.C. v. Collegeville/Imagineering*, 2007 WL 2051448, at *8 (D. Ariz. July 16,

2007) (concluding plaintiff put forth prima facie evidence of material adverse

action by showing supervisor with requisite power threatened to terminate

plaintiff); *Lee v. Winter*, 439 F. Supp. 2d 82, 85 (D. D.C. 2006) (finding threat of

reduced compensation constitutes materially adverse action after *Burlington*);

*Killen v. Nw. Human Servs., Inc.*, 2007 WL 2684541, at *7 (E.D. Pa. Sept. 7, 2007)

(finding that the threat of placement on administrative leave could have dissuaded

a reasonable employee from making a discrimination claim).  "A fair reading of

[*Burlington*] reveals that the case imposes no requirement that a threat be fulfilled."

*Walsh v. Irvin Stern's Costumes*, 2006 WL 2380379, at *2 (E.D. Pa. Aug. 15,

2006); *see also Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1090 (10th Cir.

2007) (finding combination of threats and actions could dissuade reasonable

employee).

 In the present case, Plaintiff suffered adverse employment actions

prior to the First Action because before Plaintiff filed the First Action, the

University had threatened to both suspend Plaintiff -- which would reduce his

compensation and effectively place him on administrative leave -- and terminate

his employment entirely.  On February 2, 2006, Hitz recommended that Plaintiff be

suspended for fourteen days in response to the Garrett Complaint and Konan

confirmed the suspension on February 22, 2007.  In informing Plaintiff of this

proposed suspension, Hitz expressed concern about Plaintiff's future with the

University, stating that Plaintiff "created a hostile environment that [made]

problem solving and the civil exchange of ideas impossible."  Sato Decl. Ex. A at

24.

 Similarly, on February 24, 2006, Hitz recommended that Plaintiff be

suspended for thirty days in response to the Sakaguchi Complaint and Konan

confirmed the suspension on February 22, 2007.  *Id*. Ex. B at 9-10.  Finally, on March 5, 2007, Young, who had replaced Hitz, issued three separate recommendations that Plaintiff be terminated -- one of which rested on the Tashima Complaint.  *Id*. Ex. C at 14-15; Pl. Decl. ¶ 136.  In July 2007, during the pendency of the First Action, Konan supported all three of Young's recommendations to terminate Plaintiff.  Pl. Decl. ¶ 137.  In sum, the University's threats to suspend and terminate Plaintiff were severe, extended over a period of time, and ultimately actions that "a reasonable employee would have found . . . materially adverse."  *See Burlington*, 548 U.S. at 68.

Plaintiff now seeks to challenge the University's same efforts to suspend and terminate him that were ongoing prior to the filing of the First Action and signing of the Settlement Agreement.[7]  Notably, prior to the First Action and Settlement Agreement, in addition to threatening Plaintiff, the University concretely acted against Plaintiff by relieving him of his teaching duties, prohibiting him from entering the University campus, and forbidding him from contacting other faculty and staff.  On March 2, 2007, when the University

---

[7]  Although Plaintiff contends in Count II that "the suspensions and termination of D'Andrea constituted retaliation," Plaintiff in fact challenges not the suspensions and termination themselves -- for these sanctions were imposed by a neutral arbitrator -- but the University's actions in recommending and pursuing the suspensions and termination.  While the arbitrator's decisions post-date the First Action, the University's acts and threats do not.

imposed these conditions, Konan told Plaintiff that his behavior was "intimidating and bullying." First Action Compl. Ex. A at 1. Konan also informed Plaintiff that the "University must take immediate action . . . to avoid further disruption of the operations of the University." *Id.* From these circumstances, Plaintiff undoubtedly faced threats that would deter a reasonable employee from engaging in protected activities.

Thus, at the time the First Action was filed, Plaintiff could have challenged his suspensions and termination because the University had taken all the actions necessary to discipline Plaintiff pursuant to the CBA. Although these disciplinary measures could not yet be effected at the time of the First Action -- because the CBA requires that an arbitrator decide and impose contested punishments -- Plaintiff nevertheless knew of the totality of Defendants' now-contested acts at the time he filed the First Action and signed the Settlement Agreement. As a result, when Plaintiff agreed to "forever release, acquit, and discharge" all claims that could have been raised in the First Action, Plaintiff released his right to challenge his allegedly retaliatory suspensions and termination.

In opposition, Plaintiff contends that his suspensions and termination were not included in the Settlement Agreement because these actions were

finalized only after Plaintiff released his claims.[8]  Although Plaintiff is correct that

his suspensions and termination were finalized only later -- his fourteen- and

thirty-day suspensions became final on December 3, 2008 and February 9, 2009

respectively, and his termination became final on November 4, 2009 -- the timing

of these sanctions is not dispositive in determining whether Plaintiff released his

rights to dispute them.  As the court discussed above, Plaintiff could have

challenged his suspensions and termination even before they were finalized.  The

University threatened Plaintiff with these severe sanctions long before they were

ultimately imposed and, significantly, prior to Plaintiff bringing the First Action.

As a result, Plaintiff could have raised his suspensions and termination in the First

Action and -- contrary to Plaintiff's contention -- Plaintiff thus released these

claims in the Settlement Agreement.

---

[8]  The parties dispute when Plaintiff's suspensions and termination became final. Defendants contend that the court should apply the Supreme Court's holding in *Delaware State College v. Ricks*, 449 U.S. 250, 261 (1980), which found that "[t]he grievance procedure, by its nature, is a *remedy* for a prior decision."  Plaintiff contends, however, that the court should apply *Ross v. Stouffer Hotel Co.*, 76 Haw. 454, 879 P.2d 1037 (1994), which held that the statute of limitations began to run on an unlawful discharge claim when the termination was actually finalized.  The parties' caselaw disputes are inapposite, however, because the CBA is controlling in the present case.  The CBA provides that Plaintiff's suspensions and termination were not "final and binding" until the completion of the grievance process.  Sato Decl. Ex. A at 5.

b.      *Count III: First Amendment challenge to the Executive Policy*

In Count III, Plaintiff brings a facial challenge to the Executive Policy, which Plaintiff contends is overbroad and vague.  To determine if Plaintiff's claim in Count III could have been asserted in the First Action, the court must determine whether's Plaintiff's Count III claim was ripe when the first Action was filed on April 11, 2007.

At the time Plaintiff filed the First Action, the University had threatened to suspend him for both fourteen and thirty days as well as terminate him for alleged violations of the Executive Policy.  Such "'genuine threat of enforcement' [are] sufficient to render a claim ripe for review." *Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009) (citing *City of Houston v. Hill*, 482 U.S. 452, 459 (1987)).  Particularly in the First Amendment context, pre-enforcement suits are permitted because self-censorship and chilling are harms that may be realized long before a threat is carried out.  *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).  Accordingly, the court finds that Plaintiff could have asserted the overbreadth and vagueness claims now brought in Count III in the First Action because, at the time of the First Action, Plaintiff had "an actual and well-founded fear that [the Executive Policy] [would] be enforced against [him]." *Id.*

25

**2.      *Claims that "aris[e] out of or [relate] in any way" to the First Action***

Even if Plaintiff's claims could not have been brought in the First

Action, all of these claims are nonetheless encompassed by the broader "aris[e] out

of or [relate] in any way" language also used to define "Claims" released by the

Settlement Agreement.  All of Plaintiff's present claims arise out of and concern

the same "disciplinary and related grievance processes between Professor

D'Andrea and Defendant University of Hawaii" that Plaintiff identified in the First

Action.  First Action Compl. ¶ 13.  In the First Action, these disciplinary and

related grievance processes were known to Plaintiff and disputed by Plaintiff.

Further, the consequences of these grievance processes, including

termination, were foreseeable to Plaintiff at the time he filed the First Action.

Plaintiff attached a letter from Konan to the Complaint in the First Action that

referenced the complaints against Plaintiff that later resulted in Plaintiff's

suspensions and termination.  Konan stated in his letter that "the University must

take immediate action to respond" to concerns about Plaintiff's "intimidating and

bullying behavior."  *Id*. Ex. A at 1.  This exhibit to the Complaint in the First

Action thus concerns the same facts that Plaintiff now alleges in the present case.

In sum, the court finds that Plaintiff's present claims all arise out of

and relate to the First Action.  As a result, Plaintiff's present claims are "Claims"

that were released by the Settlement Agreement.

## C.     Exemption from the Settlement Agreement

Plaintiff contends that the Settlement Agreement did not release his

present claims because the Settlement Agreement exempted claims relating to

Plaintiff's suspensions and termination from its terms.  The plain language of the

Settlement Agreement demonstrates, however, that Plaintiff's reading is incorrect.

In relevant part, the Settlement Agreement states that:

> (ii)     The releases shall not affect any proceedings,
> claims, grievances and/or other actions instituted prior to
> the execution of this Agreement pursuant to the 2003-
> 2009 Agreement by and between UH Professional
> Assembly and the Board of Regents of UH ("CBA") . . . .

Nakasone Decl. Ex 2 at 5.  By its terms, this provision excludes only those actions

brought *pursuant to* the CBA.  Included, then, in this exclusion were the

University's grievance proceedings against Plaintiff -- including arbitration of the

Garrett, Sakaguchi, and Tashima Complaints.

Plaintiff's present claims are not included in the exception, however,

because Plaintiff's present claims are not brought pursuant to the CBA.  Instead,

Plaintiff challenges the Defendants' actions on statutory and constitutional

grounds.  Based on the record provided to the court, Plaintiff could not, in fact,

raise his challenges pursuant to the CBA because the CBA's grievance procedure

27

only governs how the University may sanction and discipline its employees.

Although the CBA allows employees to defend themselves through grievance

proceedings, it apparently does not govern how an employee can otherwise

challenge the University -- which is what Plaintiff seeks to do here.  Accordingly,

the court finds that Plaintiff's present claims concerning his suspension and

termination were not exempted from the Settlement Agreement by the exclusion

clause.

In sum, the court finds that the suspensions and termination Plaintiff

now seeks to challenge could have been raised in the First Action and, in any

event, arise out of and relate to the First Action.  Because Plaintiff agreed to

"forever release, acquit, and discharge" these claims in the Settlement Agreement,

the court finds that Plaintiff cannot maintain his present action.

///

///

///

///

///

///

///

# V.  **CONCLUSION**

Based on the above, the court GRANTS Defendants' Motion for

Summary Judgment on Plaintiff's Third Amended Complaint for Declaratory and

Injunctive Relief and Damage.  The Clerk of Court is directed to close the case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 22, 2010.



 /s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*D'Andrea v. Univ. of Haw. et al.,* Civ. No. 09-00105 JMS/BMK, Order Granting Defendants' Motion for Summary Judgment on Plaintiff's Third Amended Complaint for Declaratory and Injunctive Relief and Damage